IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANET CORNWELL, | ) | CASE NO. 4:15CV764 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Janet Cornwell ("Cornwell") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

A set forth more fully below, the Administrative Law Judge ("ALJ") failed to explain whether he accounted for Cornwell's foot and back impairments and, thus, the Court is unable to conduct a meaningful review.  Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED**.

## I. Procedural History

On July 26, 2011, and August 14, 2011, Cornwell protectively filed an application for DIB and SSI, respectively, alleging a disability onset date of August 15, 2006.  Tr. 12, 202, 209.  She alleged disability based debilitating depression.  Tr. 238.  After denials by the state agency initially (Tr. 134, 138) and on reconsideration (Tr. 146, 152), Cornwell requested an

1

administrative hearing. Tr. 159. A hearing was held before Administrative Law Judge ("ALJ") Keith J. Kearney on September 24, 2013. Tr. 28-66. In his November 5, 2013, decision (Tr. 12-21), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Cornwell can perform, i.e., she is not disabled. Tr. 20. Cornwell requested review of the ALJ's decision by the Appeals Council (Tr. 7) and, on February 14, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Cornwell was born in 1964 and was 47 years old on the date her application was filed. Tr. 20. She previously worked as a bus attendant, production assembler, and cleaner. Tr. 344. She completed high school and graduated from a pharmacy tech program. Tr. 50-51, 238.

### B. Relevant Medical Evidence[1]

On June 5, 2008, Cornwell underwent a bone density study. Tr. 601. The result indicated that she was considered osteopenic with a moderate fracture risk pursuant to the World Health Organization guidelines.[2] Tr. 601.

On September 30, 2009, Cornwell presented for a podiatry consultation complaining of bilateral foot pain in her first metatarso-phalangeal ("MP") joints and ingrown toenails. Tr. 709. Upon examination, podiatrist Jodi L. Long, DPM, observed a limited range of motion in Cornwell's MP joints. Tr. 713-714. X-rays revealed mild degenerative changes in both MP joints. Tr. 1535.

---

[1] Cornwell only challenges the merits of the ALJ's decision with respect to her physical impairments. *See* Doc. 15. Accordingly, only the medical evidence relating to Cornwell's physical impairments is summarized herein.

[2] Osteopenia is reduced or lower-than-normal bone mass. *See Dorland's Illustrated Medical Dictionary*, 32nd Edition, 2012, at 1347-1348.

On February 23, 2011, Cornwell went to the doctor because her "back went out." Tr. 1876. An x-ray of her lumbar spine showed mild spondylosis with minimal disc space narrowing at the L5-S1 level with anterior spurs at L4 and L5. Tr. 595. On March 4, 2011, she reported some improvement in her pain. Tr. 671. She stated that she usually experiences pain with prolonged sitting or when rising from sitting to standing. Tr. 671. Upon examination, her range of motion in her lumbar spine was within normal limits with no increased pain noted. Tr. 672. She was urged to continue physical therapy once a week for three to six weeks and her prognosis was good "with time and compliance." Tr. 672.

On July 8, 2011, Dr. Long performed a bilateral nail avulsion to address Cornwell's chronic ingrown toenails. Tr. 1839-1841.

On August 3, 2011, Cornwell had bone spurs removed from both her MP joints. Tr. 858-861, 2236-2238. During a follow-up on October 21, 2011, Cornwell reported that her pain was 0 out of 10 except for random, occasional fleeting jolts of pain. Tr. 792-793. She stated that she was happy she had the surgery, was happy with the outcome, and that she tolerated wearing shoes and her daily activities well. Tr. 793. She had localized swelling in her MP joints and was deemed clinically healed. Tr. 797. She was advised to continue activity and wearing shoes as tolerable. Tr. 797. X-rays revealed no evidence of spur formation or recurrence. Tr. 798. On November 18, 2011, x-rays revealed small spurs on her MP joints as well as heel spurs. Tr. 581-582.

On December 7, 2011, Cornwell complained of exacerbation of her back pain for the last three months that recently began radiating into her left thigh. Tr. 637. Her pain was 4/10. Tr. 637. She was instructed to continue physical therapy once a week for the next three to six weeks and was issued a TENS unit. Tr. 634-635, 879.

On March 15, 2012, x-rays of Cornwell's feet showed mild degenerative changes in her MP joints, small heel spurs, and a small talar spur.  Tr. 2315.

On April 24, 2012, Cornwell visited pain management for her back pain.  Tr. 2246.  She reported falling from a telephone pole while working as a line repairperson in 1983 as the source of her on-again/off-again back pain.  Tr. 2246.  She stated that the TENS unit helped, exercise sometimes helped, and that naproxen provided some benefit.  Tr. 2247.  Upon examination, Physician Assistant Patricia Filus found Cornwell to have a normal gait and strength in her lower extremities but a limited range of motion in her back and tenderness in her lumbar spine.  Tr. 2250.  Filus assessed Cornwell with lumbar disc degeneration at L5-S1 with radiculopathy at L5; she stated that "she also seems to have, at least, a mild, left, greater trochanteric bursitis which may be playing a role in this pain picture."  Tr. 2250.

On May 31, 2012, Cornwell saw rheumatologist David Blumenthal, M.D, upon the referral of her podiatrist for "multiple joint complaints."  Tr. 2336-2337.  Cornwell complained of back, hip, knee, ankle, and foot pain as well as shoulder stiffness.  Tr. 2336.  Upon examination, Cornwell had positive tender points throughout her body.  Tr. 2336-2337.  Dr. Blumenthal assessed her with fibromyalgia and early osteoarthritis.  Tr. 2337.  He noted that Cornwell had three contributors to her pain: fibromyalgia (related to stress, depression, anxiety, and PTSD), obesity (aggravating pains in the low back, hips, and knees), and mild osteoarthritis of her first MP joints bilaterally.  Tr. 2336-2337.  Cornwell was given orthotics on June 8, 2012.[3]  Tr. 2335.

---

[3] An orthotic is an orthopedic appliance or apparatus used to support and improve the function of movable parts of the body.  *See Dorland's*, at 1138.

On October 15, 2012, Cornwell received an epidural injection in her lumbar spine at L5-S1.  Tr. 2384-2385.  The treatment note indicated that Cornwell had a prior lumbar spine injection and reported receiving pain relief for four months afterwards.  Tr. 2384.

On December 11, 2012, Cornwell presented to Dr. Long with painful ingrown toenails that were too sore to touch.  Tr. 2466.  Dr. Long debrided her toenails.  Tr. 2469.

Cornwell received another lumbar spine injection in January 2013.  Tr. 2458.  She reported that she received only six weeks of relief after the last injection, which was performed midline, as opposed to the four months of relief she experienced after her first injection, which was left-sided.  Tr. 2458.  In July 2013, Cornwell received another lumbar spine injection.  Tr. 2418.

On July 26, 2013, Cornwell returned to Dr. Long with a two week history of painful swelling in her right foot.  Tr. 2392-2396.  She stated that she could have kicked something in her sleep.  Tr. 2394.  An x-ray of her right foot revealed a fracture of the second metatarsal joint and a possible dislocation mid-foot.  Tr. 2397.  Mild degenerative changes at her MP joint were present and calcification at her heel remained.  Tr. 2397.  An x-ray of her left foot was unremarkable.  Tr. 2396.

    **C. Testimonial Evidence**

        **1. Cornwell's Testimony**

Cornwell was represented by counsel and testified at the administrative hearing.  Tr. 29-55.  She lives in an apartment by herself.  Tr. 41-42.  She does chores sometimes; she is prevented from doing them all the time because she has no motivation or energy.  Tr. 42.  She leaves her house once a week to go to her mother's house or to the store to "walk around."  Tr. 43.  She has a driver's license but no car; she gets around by taking the bus.  Tr. 53.

Cornwell described low back pain radiating to her left hip. Tr. 35. On a scale of one to ten, on an average day, her pain is a five or a six. Tr. 35. Her pain comes and goes and is present about four days a week. Tr. 35. She also experiences numbness and tingling in her fingers. Tr. 35. She was prescribed a cane by her doctor who performed her lumbar injections in 2012 and she uses it "mostly all the time." Tr. 35. She had surgery on both feet for bunions that were causing problems. Tr. 36. She also broke her foot a month and a half before the hearing and stated that it is healing. Tr. 36.

Cornwell was diagnosed with fibromyalgia, which causes pain in her hands, wrists, elbows, shoulder, and down the back of her legs. Tr. 43-44. She experiences this pain every day. Tr. 44. It is constant, although some days are worse than others. Tr. 44. On a scale of one to ten, her pain is an eight. Tr. 44. She described problems using her hands to open things like bottles and to manipulate buttons and zippers. Tr. 45. She has difficulty walking because her back pain goes into her hip. Tr. 45. Sitting for two or more hours also causes stiffness. Tr. 46. She cannot lift fifteen pounds; if she tries to lift more than that she will have "a real bad back, like a back spasm." Tr. 46.

Cornwell stated that she stopped working for her sister's cleaning business because of the pain in her hands when she tried to wring out rags or when she stooped to clean the bottoms of things. Tr. 48. She takes naproxen for pain as needed and sometimes takes it twice a day. Tr. 52. She is no longer taking hydrocodone, which she took after she broke her foot. Tr. 52. She does not know how she broke her foot; she just "looked down one day and it was start swelling up." Tr. 54.

**2. Vocational Expert's Testimony**

6

Vocational Expert Ted Stephen Macy ("VE") testified at the hearing.  Tr. 55-64.  The ALJ asked the VE to determine whether jobs would be available to a hypothetical individual of Cornwell's age, education and work experience who could perform light work if the individual had the following characteristics: requires a cane for ambulation; can perform frequent bilateral foot controls; can frequently handle and finger bilaterally; can occasionally climb ramps and stairs but never ladders, scaffolds, or ropes; can occasionally stoop, kneel crouch and crawl; requires a sit/stand option, at-will, provided that she is not off-task more than 10% of the workday; is limited to hearing and understanding simple oral instructions and communicating simple information; must avoid hazards such as heights or machinery but is able to avoid ordinary hazards in a workplace such as boxes on the floor, doors ajar, approaching people, or vehicles; cannot perform at a production pace akin to assembly line work but can perform goal-oriented work such as an office cleaner; can make simple work-related decisions with occasional interaction with supervisors; can have occasional, casual interaction with co-workers who would be a small group of individuals; can never interact with the public; and can tolerate few changes in a routine work setting that, when they did occur, would be infrequent and gradually introduced.  Tr. 57-59.  The VE answered that such an individual could not perform light work but could perform jobs at the sedentary level such as a table worker (400 northeast Ohio jobs; 54,000 national jobs), final assembler (600 northeast Ohio jobs; 90,000 national jobs), and bonder (250 northeast Ohio jobs; 40,000 national jobs).  Tr. 59-60.  The ALJ asked the VE which of the restrictions he had listed prohibited the individual from performing work at the light exertional level and the VE replied, "most obviously [it] would be the sit/stand option alternately at will."  Tr. 60.

The ALJ asked the VE to consider whether a hypothetical individual could perform light work if that individual had the same limitations described above, except that the sit/stand option would be limited to alternating every half hour. Tr. 61. The VE stated that the individual could perform light work if doing so would not require the individual to be away from the work station or off-task for more than a few minutes. Tr. 61. The ALJ asked the VE what jobs such an individual could perform and the VE answered that such an individual could perform work as a wire worker (750 northeast Ohio jobs; 105,000 national jobs), electronic worker (450 northeast Ohio jobs; 60,000 national jobs), and assembly press operator (650 northeast Ohio jobs; 105,000 national jobs). Tr. 61-62. The ALJ asked the VE whether the hypothetical individual could perform these light jobs if the individual would be absent at least three days per month. Tr. 62. The VE stated that there would be no jobs such an individual could perform. Tr. 62.

Next, Cornwell's attorney asked the VE if the second hypothetical individual described by the ALJ could perform work if that individual were limited to only occasional bilateral fine and gross manipulation. Tr. 63. The VE answered that there would be no jobs available to such an individual. Tr. 63. Cornwell's attorney asked the VE whether the third hypothetical individual described by the ALJ could perform work if the individual were off-task 20% of the day. Tr. 63. The VE replied that there would be no jobs the individual could perform. Tr. 63. When asked what percentage an individual would be permitted to be off-task, the VE answered that around 10% was permissible. Tr. 63-64.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

8

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his November 5, 2013, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2014. Tr. 14.

2. The claimant has not engaged in substantial gainful activity since August 15, 2006, the alleged onset date. Tr. 14.

3. The claimant has the following severe impairments: bipolar disorder, posttraumatic stress disorder [PTSD], fibromyalgia, hand pain. Tr. 14.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 15.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: she requires a cane for prolonged ambulation. She can frequently operate hand controls bilaterally, and can [] frequently handle and finger. The claimant can occasionally climb ramps and stairs but can never use ladders, ropes, or scaffolds. She can occasionally balance, kneel, stoop, crouch, and crawl. She is limited to hearing and understanding simple instructions and is limited to communicating simple information. She is restricted from working near hazards such as unprotected heights and dangerous moving machinery, but she is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, and approaching people and vehicles. The claimant cannot perform at a production rate pace (e.g., assembly line work), but she can perform goal oriented work (e.g., office cleaner). She is limited to simple work related decisions, and occasional interactions with supervisors. She can tolerate occasional interactions with a small group of co-workers, where the contact is casual in nature. She cannot interact with the public. The claimant is limited to tolerating few changes in a routine work setting. When said changes do take place, they would happen gradually

---

C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

       and occur infrequently.  She requires a sit stand option, changing positions every thirty minutes.  Tr. 17.

6.     The claimant is unable to perform any past relevant work.  Tr. 20.

7.     The claimant was born on February 2, 1964 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 20.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 20.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 20.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 20.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 15, 2006, through the date of this decision. Tr. 21.

### V. Parties' Arguments

Cornwell objects to the ALJ's decision on two grounds.  She argues that the ALJ violated the treating physician rule with respect to the opinion of her treating psychiatrist, Dr. Bogyi, and that the ALJ's decision failed to address Cornwell's foot and back impairments.  Doc. 15, pp. 10-14.  In response, the Commissioner submits that the Court should not review Dr. Bogyi's opinion because it was not part of the record before the ALJ and that the ALJ properly accounted for all of Cornwell's physical limitations.  Doc. 19, pp. 6-10.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

11

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ was not required to consider the opinion of Cornwell's treating psychiatrist, Dr. Bogyi

Cornwell argues that the ALJ erred because he did not discuss the opinion of her treating psychiatrist, Dr. Bogyi.  Doc. 15, p. 11.  Defendant points out that Dr. Bogyi's opinion, dated October 10, 2013 (Tr. 2514-2515), was not part of the record before the ALJ because Cornwell submitted Dr. Bogyi's opinion on October 17, 2013 (Tr. 2513), after the Hearing and just prior to the date of the ALJ's decision, November 5, 2013.  Doc. 18, p. 6.  The Appeals Council considered Dr. Bogyi's opinion but declined to disturb the ALJ's decision.  Tr. 4.

"[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  Accordingly, the Court may not consider Dr. Bogyi's opinion.  And, as Defendant notes, Cornwell could have requested a remand, pursuant to sentence six of 41 U.S.C. § 405(g), if she could show that Dr. Bogyi's opinion is new and material and she had good cause for not presenting it earlier, but

Cornwell did not request a sentence six remand. Doc. 18, p. 7, n. 4. Nor did she respond to Defendant's argument in her reply brief. Cornwell's first argument, therefore, is without merit.

### B. The ALJ did not expressly consider Cornwell's foot and back impairments and, therefore, the Court cannot conduct a meaningful review

The gist of Cornwell's second argument is that the ALJ failed to consider her back and foot impairments in any step of the disability determination.[5] Doc. 15, p. 13. She specifically argues that the ALJ failed to consider whether her back and foot impairments were severe and failed to consider significant evidence regarding her back and foot pain in his RFC assessment. Doc. 15, p. 14. Defendant asserts that the ALJ accounted for Cornwell's foot and back impairments when he discussed her fibromyalgia. Doc. 18, p. 8.

Although Cornwell's arguments are not well-articulated, the Court is unable to determine whether substantial evidence supports the ALJ's decision because of an utter lack of discussion regarding Cornwell's foot and back pain in the ALJ's decision. True, the ALJ discussed Cornwell's fibromyalgia, which he found to be a severe impairment, in one paragraph of his decision (and the only paragraph describing physical impairments). Tr. 17-18. However, the ALJ did not mention Cornwell's foot impairments, which are discussed in great detail in the record; nor did he discuss her back impairment, which is also discussed in the record. Even assuming that the ALJ considered Cornwell's back pain when discussing her fibromyalgia, the Court has a harder time assuming that the ALJ's discussion of fibromyalgia also took into account her foot problems, given the objective evidence in the record documenting Cornwell's recurrent bone spurs, her foot fracture, and her diagnosis of osteopenia. Indeed, rheumatologist

---

[5] Cornwell's brief includes inconsistent statements; she first argues that the ALJ's conclusion that she could perform past relevant work was erroneous; however, the ALJ found that Cornwall could not perform her past relevant work. Doc. 15, p. 12; Tr. 20. Next, Cornwell contends, "this case hinges on the fifth step" but then goes on to argue that the ALJ erred at Step Two. Doc. 15, p. 13.

13

Dr. Blumenthal assessed her with fibromyalgia and early osteoarthritis and identified three contributors to her pain: fibromyalgia (related to stress, depression, anxiety, and PTSD), obesity (aggravating pains in the low back, hips, and knees), and mild osteoarthritis of her first MP joints bilaterally.  Tr. 2337.  Thus, it cannot be said that the record supports a conclusion that all Cornwell's impairments stemmed from her fibromyalgia, and the ALJ's generalized summary discussion of Cornwell's fibromyalgia does not suffice to address her foot impairments.[6]

Moreover, the ALJ only cited to two treatment notes in the record.[7]  The first is a consultation with pain management and documents Cornwell's complaints of intermittent, chronic back pain.  Tr. 18 (citing "11F2-3," Tr. 2246-2247).  The second references full muscle strength in all of her joints.  Tr. 18 (citing "16F8," Tr. 2396).  And, although the ALJ stated, in his Step Three determination, that he considered Listing 1.02, "Major dysfunction of a joint(s) (due to any cause)," he provided no attendant explanation; it is not even clear that he considered Cornwell's MP joint.  Tr. 15.  Because the ALJ's decision failed to include any discussion with respect to Cornwell's foot and back impairments, the Court cannot conduct a meaningful review of his decision.  Thus, remand is required.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-249 (6th Cir. 2007) (the ALJ's decision must be specific enough to enable meaningful appellate review); *Doneff v. Comm'r of Soc. Sec.*, 2015 WL 4464901, at *8-9 (S.D.Ohio July 21,

---

[6] The ALJ referred to fibromyalgia as "a psychosomatic disorder involving largely subjective levels of pain" (Tr. 18); however, as described above, Cornwell's foot problems are documented by objective clinical evidence such as x-rays and her osteopenia is documented in a bone density scan.  The ALJ did observe that the "lack of any documented extreme findings to support directly the alleged total joint pain raises serious doubts about the veracity of the claimant's allegations."  Tr. 18.  Without more, however, the Court is unable to find that the ALJ's observation was referring to Cornwell's foot impairments.  Moreover, at the hearing, Cornwell described her foot and back impairments separate from her fibromyalgia pain.  *See, e.g.*, Tr. 35-36, 44.

[7] The ALJ cited to a third treatment note but that note, which he describes as objective evidence regarding her alleged joint pain, is a mental health discharge report from 2006, prior to her alleged onset date.  *See* Tr. 18 (citing "6f7"); Tr. 429 (discharge report dated July 25, 2006, explaining that Cornwell was hospitalized for depression).

2015) (remand is required when the ALJ's lack of articulation prevents the court from conducting a meaningful review) (collecting cases).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[8]

Dated: March 9, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[8] This Order should not be construed as a recommendation that, on remand, Claimant be found disabled.